**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

COMITE DE JORNALEROS DE
REDONDO BEACH; NATIONAL DAY
LABORER ORGANIZING NETWORK,
    *Plaintiffs-Appellees,*

    v.

CITY OF REDONDO BEACH,
    *Defendant-Appellant.*

No. 06-55750

D.C. No.
CV-04-09396-CBM

COMITE DE JORNALEROS DE
REDONDO BEACH; NATIONAL DAY
LABORER ORGANIZING NETWORK,
    *Plaintiffs-Appellees,*

    v.

CITY OF REDONDO BEACH,
    *Defendant-Appellant.*

No. 06-56869

D.C. No.
CV-04-09396-CBM

OPINION

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, District Judge, Presiding

Argued and Submitted
May 9, 2008—Pasadena, California

Filed June 9, 2010

8353

Before: Kim McLane Wardlaw and Sandra S. Ikuta,
Circuit Judges, and Ralph R. Beistline,* District Judge.

Opinion by Judge Ikuta;
Dissent by Judge Wardlaw

---

*The Honorable Ralph R. Beistline, United States District Judge for the District of Alaska, sitting by designation.

## COUNSEL

Philip Hwang and Robert Rubin, Lawyers' Committee for Civil Rights, San Francisco, California, and Cynthia A. Valenzuela, Mexican American Legal Defense and Educational Fund, Los Angeles, California, counsel for the appellee.

Julie Fleming, Manning & Marder, Kass, Ellrod, Ramirez LLP, Los Angeles, California, and Michael Webb, Office of the City Attorney, Redondo Beach, California, counsel for the appellant.

## OPINION

IKUTA, Circuit Judge:

This appeal raises a First Amendment challenge to Redondo Beach Municipal Code § 3-7.1601, which prohibits the act of standing on a street or highway and soliciting employment, business, or contributions from the occupants of an automobile. We have previously upheld a virtually identical ordinance against a constitutional challenge. *See ACORN v. City of Phoenix*, 798 F.2d 1260, 1273 (9th Cir. 1986). We reach the same result here and hold that the Redondo Beach ordinance is a valid time, place, or manner restriction. Accordingly, we reverse the contrary decision of the district court.

I

The facts giving rise to this controversy can be traced back to *ACORN*, where the Association of Community Organizations for Reform Now (ACORN), a non-profit political action organization, raised a First and Fourteenth Amendment challenge to a Phoenix ordinance that read: "No person shall stand on a street or highway and solicit, or attempt to solicit, employment, business or contributions from the occupants of any vehicle." *Id.* at 1262. According to ACORN, the challenged ordinance deterred its members from "tagging." As we explained, "[t]agging . . . involves an individual stepping into the street and approaching an automobile when it is stopped at a red traffic light. The individual asks the occupants of the vehicle for a contribution to ACORN and distributes a slip of paper, or 'tag,' providing information about ACORN and its activities." *Id.*

We determined that the restrictions imposed by the Phoenix ordinance were content neutral, narrowly tailored to serve a significant government interest, and left open ample alternative channels of communication. *Id.* at 1267-71. Accordingly,

we concluded that the ordinance was a reasonable time, place, or manner restriction which did not violate ACORN's First Amendment rights. *Id.* at 1273. We also rejected ACORN's argument that the ordinance was facially overbroad because it would deter not only ACORN's tagging at intersections, but also persons soliciting "on the sidewalks of Phoenix, during parades or demonstrations, or on streets closed to vehicle traffic." *Id.* at 1272. Because the ordinance was narrow, and prohibited "only solicitation in the streets 'from the occupants of any vehicle,' " *id.*, we concluded that ACORN's overbreadth argument ran "completely contrary to the language of the ordinance," *id.* at 1273.

Some eight months after we decided *ACORN*, Redondo Beach's city attorney proposed that the city adopt an ordinance "identical to one recently approved by the 9th circuit court of appeals." A memorandum from the city attorney to the mayor explained that "the City has had extreme difficulties with persons soliciting employment from the sidewalks along the Artesia corridor over the last several years. . . . There can be little question that traffic and safety hazards occur by this practice." A later memorandum by the same city attorney stated that the "ordinance was designed to alleviate sidewalk congestion and traffic hazards which occurred when large numbers of persons congregated on the sidewalks during the rush hours to obtain temporary employment."

Using *ACORN* as a guide in drafting its own ordinance, Redondo Beach enacted Redondo Beach Municipal Code § 3-7.1601, which provides:

> It shall be unlawful for any person to stand on a street or highway and solicit, or attempt to solicit, employment, business, or contributions from an occupant of any motor vehicle. For purposes of this section, "street or highway" shall mean all of that area dedicated to public use for public street purposes and shall include, but not be limited to, road-

ways, parkways, medians, alleys, sidewalks, curbs, and public ways.[1]

The first sentence of the Redondo Beach ordinance is identical to the operative language of the Phoenix ordinance from *ACORN*. *See* 798 F.2d at 1262. The second sentence adds the California Vehicle Code's definitions of "street," and "highway." *See* Cal. Veh. Code §§ 360, 590 (2009). In 1989, Redondo Beach added subsection (b) imposing a correlative restriction on drivers. It states: "It shall be unlawful for any person to stop, park or stand a motor vehicle on a street or highway from which any occupant attempts to hire or hires for employment another person or persons." As the city attorney explained in an earlier memorandum, "[b]y adopting this amendment, both the prospective employee and employer would be subject to a misdemeanor offense for soliciting the other from a street or highway."

After passage of the ordinance, Redondo Beach continued to experience traffic problems related to persons soliciting employment from automobiles at two of the city's intersections. In October 2004, Redondo Beach undertook "an enhanced effort" to enforce the Redondo Beach ordinance at these two intersections. Throughout October and November 2004, Redondo Beach police officers, sometimes posing as potential employers, arrested multiple persons for violating subsection (a) of the ordinance, and cited one person for violating subsection (b). According to the officer who was in charge of the enforcement project, "[d]ay laborers were only contacted and arrested when they were on the sidewalk and approached a stopped vehicle. The prospective employer who was charged with violation of Municipal Code Section 3-7.1601(b) was contacted because he stopped in a traffic lane to conduct a hiring discussion with day laborers."

---

[1]In 1989, this text became subsection (a) of the ordinance.

On November 16, 2004, Comite de Jornaleros de Redondo Beach (Comite) and the National Day Laborer Organizing Network (NDLON) filed this suit in district court. Comite identifies itself as "an unincorporated association comprised of day laborers who . . . regularly seek work in the City of Redondo Beach," and NDLON identifies itself as "a nationwide coalition of day laborers and the agencies that work with day laborers." Their complaint alleged that the Redondo Beach ordinance deprived them and others of free speech rights guaranteed by the First and Fourteenth Amendments, and sought injunctive, monetary, and declarative relief under 42 U.S.C. § 1983 and 28 U.S.C. § 2201. The district court issued a temporary restraining order, and later a preliminary injunction barring enforcement of the Redondo Beach ordinance. We affirmed the preliminary injunction in an unpublished memorandum disposition. 127 Fed. Appx. 994 (9th Cir. 2005).

Both plaintiffs and Redondo Beach moved for summary judgment, which the district court addressed in a published opinion. 475 F. Supp. 2d 952 (C.D. Cal. 2006). The district court held that the Redondo Beach ordinance was content neutral, but was nevertheless invalid because (1) it was not "narrowly tailored to promote [Redondo Beach's] interests in traffic flow and safety," and (2) it "failed to establish the existence of ample alternative channels of communication." *Id.* at 966-68. Accordingly, the district court granted the plaintiffs' motion for summary judgment, permanently enjoined Redondo Beach from enforcing its ordinance, and ordered that "all fines, penalties, or records of infractions" of the Redondo Beach ordinance "be rescinded or removed and restitution provided." *Id.* at 970. Redondo Beach timely appealed. The district court subsequently granted Redondo Beach's motion to stay the order granting partial relief pending resolution of the appeal. The district court also awarded attorneys' fees to plaintiffs pursuant to 42 U.S.C. § 1988, which Redondo Beach has also timely appealed.

We review de novo the district court's grant of summary judgment in favor of NDLON. *See*, *e.g.*, *ACLU of Nevada v. City of Las Vegas* (*ACLU II*), 466 F.3d 784, 790 (9th Cir. 2006). When considering a motion for summary judgment, we view the evidence in the light most favorable to the nonmoving party, and draw "all justifiable inferences" in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## II

Redondo Beach makes the threshold argument that Comite and NDLON lack standing to challenge the ordinance. To have standing under Article III, a plaintiff must have suffered an "injury in fact," defined as "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted). There also must be a causal connection between the injury and the defendant's conduct, and the injury must be redressable by a favorable decision. *Id*. at 561. Here Redondo Beach argues that Comite and NDLON fail to satisfy the Article III injury-in-fact requirement.

**[1]** An organization may establish a sufficient injury in fact if it substantiates by affidavit or other specific evidence that a challenged statute or policy frustrates the organization's goals and requires the organization "to expend resources in representing clients they otherwise would spend in other ways." *El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1992); *see also Fair Housing of Marin v. Combs*, 285 F.3d 899, 904-05 (9th Cir. 2002). But "standing must be established independent of the lawsuit filed by the plaintiff." *Walker v. City of Lakewood*, 272 F.3d 1114, 1124 n.3 (9th Cir. 2001).

**[2]** NDLON has met the burden to establish its standing as an organization. The record contains declarations of NDLON

officials that enforcement of the Redondo Beach ordinance has frustrated NDLON's mission "to strengthen and expand the work of local day laborer organizing groups" because it "has prevented day laborers from making their availability to work known in the City of Redondo Beach." Moreover, the ordinance has discouraged both employees and employers from participating in hiring transactions. Redondo Beach has offered no evidence to dispute these claims. NDLON also has offered uncontradicted evidence that enforcement of the ordinance has forced it to divert resources, independent of expenses for this litigation, that it would have spent in other ways. NDLON's west coast coordinator testified that she met with workers at the intersections targeted by Redondo Beach to discuss enforcement of the ordinance almost daily from the end of October 2004 until mid-December 2004, and weekly thereafter through June 2005. She also testified that she went to the police station to assist day laborers who had been arrested. NDLON's national coordinator testified that the time and resources spent in assisting day laborers during their arrests and meeting with workers about the status of the ordinance would have otherwise been expended toward NDLON's core organizing activities. In sum, NDLON has established a sufficient organizational injury for standing purposes. *See El Rescate*, 959 F.2d at 748.

**[3]** Because there is a causal connection between Redondo Beach's ordinance and NDLON's injury, and NDLON's injury would be redressable by a favorable decision, we conclude that NDLON has standing to bring this appeal. Accordingly, we have jurisdiction over this facial challenge irrespective of Comite's standing. "Where the legal issues on appeal are fairly raised by one plaintiff [who] had standing to bring the suit, the court need not consider the standing of the other plaintiffs." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 918 (9th Cir. 2004) (alteration in original) (internal quotation marks omitted). Therefore, we do not address the parties' remaining standing arguments, including Redondo Beach's evidentiary arguments. For ease of refer-

ence, we will refer to the appellees in this case collectively as NDLON.

## III

**[4]** The First Amendment guarantees that "Congress shall make no law . . . abridging the freedom of speech."[2] The Supreme Court has made clear, however, that:

> even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."

*Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).[3]

---

[2]Although the text of the First Amendment restricts "Congress," the right to free speech "is within the *liberty* safeguarded by the Due Process Clause of the Fourteenth Amendment." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 779 (1978). Accordingly, the First Amendment's limitation on "abridging the freedom of speech" applies to the states and their political subdivisions, such as Redondo Beach. *City of Ladue v. Gilleo*, 512 U.S. 43, 45 n.1 (1994).

[3]Amici contend that the ordinance restricts solicitation that "does no more than propose a commercial transaction," *Bolger v. Young's Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (internal quotation marks omitted), and therefore the ordinance should be analyzed as a regulation of commercial speech. Because the appellants did not argue to the district court or to us that the ordinance imposes restrictions solely on purely commercial speech, however, we decline to address this argument. *See*, *e.g.*, *Dodd v. Hood River County*, 59 F.3d 852, 863 (9th Cir. 1995). Moreover, we have narrowly interpreted Supreme Court precedents defining commercial speech, holding that unless statutes or ordinances expressly "limit the scope of the regulated activity to purely commercial expression," *S.O.C.,*

Redondo Beach's ordinance regulates solicitation, which we have long recognized is a form of expression that consists of both expressive content and associated conduct or acts. The "words" component of solicitation includes both written and spoken communications. *See ACLU II*, 466 F.3d at 793-94. The "acts" component of solicitation includes the conduct of the person soliciting (e.g., in-person demands requiring an immediate response, such as approaching a person or vehicle "and demanding a personal response," *ACORN*, 798 F.2d at 1269 n.8). It also includes the effects of such conduct, such as impeding the flow of traffic, causing the target of solicitation to dodge an "implied threat of physical touching," *Hill v. Colorado*, 530 U.S. 703, 724 (2000), and other "disruption and delay caused by solicitation," *United States v. Kokinda*, 497 U.S. 720, 734 (1990). *See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 683-84, 705 (1992) ("Passengers who wish to avoid the solicitor may have to alter their paths, slowing both themselves and those around them."). The dual nature of solicitation does not change the fact that solicitation is a form of expression and "[e]xpression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions." *Clark*, 468 U.S. at 293.[4]

---

*Inc. v. County of Clark*, 152 F.3d 1136, 1143-44 (9th Cir. 1998), such laws must be analyzed as if they imposed restrictions on fully protected speech. *Id.* Because the Redondo Beach ordinance does not include such an express limitation, we cannot analyze it as commercial speech.

[4]Because solicitation combines " 'speech' and 'nonspeech' elements," solicitation could be categorized as expressive conduct. *See United States v. O'Brien*, 391 U.S. 367, 376 (1968). The Supreme Court has explained that the government can regulate expressive conduct, *id.* at 376-77, and that the test to determine whether such a regulation violates the First Amendment is essentially the same as that articulated in *Ward* for time, place, and manner restrictions. *See Clark*, 468 U.S. at 298 & n.8; *see also Ward,* 491 U.S. at 798. Here, Redondo Beach did not argue that its ordinance was a valid restriction on expressive conduct, so we apply only the test articulated in *Ward* to determine whether the ordinance is constitutional. 491 U.S. at 791.

The issue here is whether Redondo Beach's ordinance was a valid limitation on speech. As in *ACORN*, we will assume that the streets of Redondo Beach constitute a perpetual public forum, even when they are in use by vehicular traffic. 798 F.2d at 1267; *see Frisby v. Schultz*, 487 U.S. 474, 481 (1988) ("[A]ll public streets are held in the public trust and are properly considered traditional public fora."). Accordingly, we must consider whether the Redondo Beach ordinance is content neutral, narrowly tailored to serve a significant governmental interest, and leaves open ample alternative channels for communication of information. *Clark*, 468 U.S. at 293. NDLON, in its cross-appeal, argues that the district court erred in concluding that the ordinance was content neutral, while Redondo Beach argues that the district court erred in holding that the ordinance was not narrowly tailored and that ample alternative channels of communication were lacking. We consider these arguments in turn, mindful of the Supreme Court's direction that we may, and generally should, construe an enactment in a manner that will allow us to uphold its constitutionality. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 n.11 (1988) ("[T]his court will presume any narrowing construction or practice to which the law is fairly susceptible." (internal quotation marks omitted)).

## A

We have held that restrictions on acts of solicitation that were passed to support legitimate government concerns unrelated to suppressing any particular message are content neutral. *See ACLU II*, 466 F.3d at 794 & n.10 (noting that "courts have held that bans on the *act of solicitation* are content-neutral," while courts have determined that bans separating out "*words of solicitation* for differential treatment" are content based (citing cases)); *see also Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (en banc) (stating that "regulations that ban certain *conduct* associated with solicitation do not violate the prohibition on content-based regulation of speech"). Indeed, this principle is well grounded in

Supreme Court precedent, which establishes that a regulation affecting speech-related activities is content neutral if it "serves purposes unrelated to the content of expression . . . even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791.

Justice Kennedy made this point in his concurring opinion in *Lee*, 505 U.S. at 705, which we have relied on in *ACLU II*, 466 F.3d at 795, and *Berger*, 569 F.3d at 1050. In *Lee*, Justice Kennedy interpreted the Port Authority's ban on solicitation in an airport as being aimed at abusive acts associated with the physical exchange of money, described as "an element of conduct interwoven with otherwise expressive solicitation." 505 U.S. at 705 (Kennedy, J., concurring). Because the Port Authority's regulation prohibiting solicitation was "directed at these abusive practices and not at any particular message, idea, or form of speech, the regulation [was] a content-neutral rule serving a significant government interest." *Id.* at 706. In sum, where a regulation is aimed at actions entwined with expressive content, the principal inquiry is whether "restrictions of this kind . . . are justified without reference to the content of the regulated speech." *Clark*, 468 U.S. at 293-94 (citing cases).

A restriction aimed at conduct does not satisfy this content neutrality test, however, when the restriction "by its very terms, singles out particular content for differential treatment." *Berger*, 569 F.3d at 1051; *see ACLU II*, 466 F.3d at 794. For example, in *ACLU II* we concluded that a municipal ordinance prohibiting solicitation throughout a five-block tract of downtown Las Vegas was content based.[5] Although we determined that the "uncontroverted evidence supports

---

[5]The ordinance "broadly" defined solicitation as "to ask, beg, solicit or plead, whether orally, or in a written or printed manner, for the purpose of obtaining money, charity, business or patronage, or gifts or items of value for oneself or another person or organization." *Id.* at 788 (internal quotation marks omitted).

that the ordinance was enacted with the purpose of controlling the secondary effects of solicitation, rather than the content of the soliciting requests themselves," *id.* at 793, we held the ordinance nevertheless "discriminates based on content on its face" because it prohibited the distribution of handbills "requesting financial or other assistance" while permitting the distribution of handbills that did not make such a request, *id.* at 794.

We came to a similar conclusion in *Berger*. There, we analyzed a rule that prohibited street performers from "actively solicit[ing] donations" at the Seattle Center.[6] *Berger*, 569 F.3d at 1035. We acknowledged that Seattle passed the rule for the content-neutral purpose of "protect[ing] Center patrons from harassment" caused by active solicitation conduct, *id.* at 1051, but held that the ordinance was content based because on its face it differentiated between messages. Specifically, the ordinance "restrict[ed] street performers from communicating a particular set of messages—requests for donations, such as 'I'd like you to give me some money if you enjoyed my performance,'" but did not prohibit street performers from actively communicating other messages. *Id.* We stated that while "this distinction [may be] innocuous or eminently reasonable, it is still a content-based distinction because it 'singles out certain speech for differential treatment based on the idea expressed.'" *Id.* (quoting *ACLU II*, 466 F.3d at 794).

**[5]** Distilling these cases, we derive the general rule that an ordinance regulating solicitation is content neutral if it is aimed at acts of solicitation and "not at any particular message, idea, or form of speech," *Lee*, 505 U.S. at 706 (Ken-

---

[6]Seattle Center Campus Rule F.3.a states: "No performer shall actively solicit donations, for example by live or recorded word of mouth, gesture, mechanical devices, or second parties." *Berger*, 569 F.3d. at 1050. This rule "does allow performers 'passively' to solicit donations by setting out a receptacle that 'may include a written sign that informs the public that such donations are sought.'" *Id.*

nedy, J., concurring). An ordinance that "by its very terms, singles out particular content for differential treatment" does not satisfy this test. *See Berger*, 569 F.3d at 1051. With these principles in mind, we analyze Redondo Beach's ordinance.

**[6]** There is no meaningful distinction between the Phoenix and Redondo Beach ordinances, and therefore we are bound by our determination in *ACORN* that the Phoenix ordinance was content neutral because it was aimed narrowly at barring acts of solicitation directed toward the occupants of vehicles, 798 F.2d at 1273, and was not related to any particular message or content of speech, *id.* at 1267. Indeed, the language of the two ordinances is identical in all material respects. Although Redondo Beach's ordinance mentions "sidewalks," and the Phoenix ordinance does not, this difference is immaterial because *ACORN* interpreted the Phoenix ordinance as applying to persons soliciting vehicles from the sidewalk, as well as those soliciting from the street. *Id.* at 1269 n.9; *see infra* at 8375. Similarly, while the Redondo Beach ordinance applies to the conduct of potential employers while the Phoenix ordinance does not, this distinction does not affect the scope of prohibited conduct, i.e., in-person demands directed at drivers that require an immediate response.

Nor does the record include evidence of any "binding judicial or administrative construction, or well-established practice" suggesting that Redondo Beach has adopted an interpretation different from that described in *ACORN*. *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1035 (9th Cir. 2006) (internal quotation marks omitted). Redondo Beach's enforcement efforts have focused exclusively on conduct without reference to content. The record establishes that officers charged only individuals who "solicit[ed] vehicles so as to cause a driver to stop in traffic," or who "approached a stopped vehicle" when the vehicle was "stopped in a traffic lane." Those who "solicit[ed] from behind the sidewalk line in adjacent shopping centers' parking

lots [were] not regulated by the Ordinance." Redondo Beach also has not prevented people from "leafleting empty parked cars, approaching cars already legally parked in the street, or holding up signs to be seen by passing cars." No one has been arrested for communicating a message by means that did not adversely affect traffic. Although the dissent notes that persons soliciting contributions challenged the Phoenix ordinance, while persons soliciting employment brought the challenge here, *see* Dissent at 8396, the dissent fails to explain why this makes a difference for purposes of a First Amendment analysis. So long as the ordinance targets conduct unrelated to the content of the message, it does not matter whether the ordinance impacts solicitation undertaken to secure employment, as in Redondo Beach, or to secure contributions, as in Phoenix. Because there is no meaningful distinction between the Phoenix ordinance and the Redondo Beach ordinance as drafted, interpreted, and enforced, we conclude that the Redondo Beach ordinance is likewise aimed at acts, does not single out particular ideas for differential treatment, and is content neutral. *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992) ("In evaluating respondent's facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it."); *see also Ward*, 491 U.S. at 795-96 ("Administrative interpretation and implementation of a regulation are, of course, highly relevant to our analysis, for in evaluating a facial challenge to a state law, a federal court must consider any limiting construction that a state court or enforcement agency has proffered." (alterations and internal quotation marks omitted)).

NDLON raises two challenges to this conclusion. First, NDLON argues that the ordinance differentiates between messages because it prohibits individuals from conveying the message "I need a job" while allowing the message "I need a vote." Second, NDLON asserts that the ordinance singles out three categories of speech (employment, business, or con-

tributions) for regulation while leaving other categories free from censor.

Both of these arguments are foreclosed by *ACORN* and *Berger*. As we explained in *Berger*, the type of ordinance at issue in *ACORN* and in this case does not restrict words of solicitation or forbid "passing out handbills asking car drivers or passengers to contribute by mail to a charity or cause." *Berger*, 569 F.3d at 1052 n.23. Rather, it is aimed at acts of on-the-spot solicitation. *Id.* An ordinance aimed at acts of solicitation rather than words "is not a content-based regulation of speech, and so does not run afoul of the content neutrality requirement." *Id.*; *see ACLU II*, 466 F.3d at 795.

NDLON's second argument, that the Redondo Beach ordinance is not content neutral because it singles out three categories of speech (employment, business or contributions) for regulation, similarly fails in light of *ACORN* and *Berger*. Moreover, an ordinance does not single out specific messages for different treatment merely because it regulates broad categories of communication. In *Hill*, the Supreme Court held that Colorado's ban on "oral protest, education, or counseling" near health care facilities without the consent of the listener is not content based. 530 U.S. at 724. According to the Court, such an ordinance "places no restrictions on—and clearly does not prohibit—either a particular viewpoint or any subject matter that may be discussed by a speaker." *Id.* at 723. Rather, it simply "establishes a minor place restriction on an extremely broad category of communications." *Id.* When an ordinance is framed as applying to such broad categories of communication, it does not "draw[ ] distinctions based on the subject that the approaching speaker may wish to address." *Id.* Like the enactment at issue in *Hill*, Redondo Beach's ordinance establishes a place restriction on particular manners of expression that fall within certain broad categories, but does not impose limitations based on disagreement with the message's content.

NDLON argues that because a police officer enforcing the Redondo Beach ordinance must listen to the content of the speech to determine whether it falls within an impermissible or a permissible category, it fails the "officer must read it" test. NDLON refers to *Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998), which held that a restriction is content based if "a law enforcement officer must examine the content" of the speaker's message to determine whether it falls within the restriction. *Id.* at 636 (internal quotation marks omitted); *see ACLU II*, 466 F.3d at 794-96.

**[7]** NDLON's reliance on the "officer must read it" test is misplaced. Two years after we decided *Foti*, the Supreme Court clarified in *Hill* that it has "*never* held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule applies to a course of conduct." *Hill*, 530 U.S. at 721 (emphasis added). Instead, "the kind of cursory examination" of the content of a conversation to determine whether it includes "oral protest, education, or counseling" does not make a regulation content based. *Id.* at 721-22; *see ACLU II*, 466 F.3d at 796 n.12. Similarly, *Berger* noted that the "officer must read it" test is only "evidence that the regulation is content-based . . . not dispositive" of it. *Berger*, 569 F.3d at 1052 n.22. Given the clear instructions in *Hill* and *Berger*, the "officer must read it" test is limited to those situations where an officer must conduct something more than a cursory examination of the content of a communication, such as where the officer must thoroughly review the communication to evaluate its "substantive message" or "idea expressed." *ACLU II*, 466 F.3d at 794, 796 n.12 (internal quotation marks omitted). Like the ordinance upheld in *Hill*, the Redondo Beach ordinance regulates broad categories of expression which require an officer to make only a cursory examination of the solicitor's communication, not a substantive evaluation of a speaker's message. Therefore, the "officer must read it" test, as formulated in *ACLU II* and *Berger*, does not support NDLON's argument that the Redondo Beach ordinance must be content based.

B

**[8]** We next turn to the question whether the Redondo Beach ordinance is "narrowly tailored to serve a significant governmental interest." *Clark*, 468 U.S. at 293. A regulation is narrowly tailored if it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 798-99 (internal quotation marks omitted). "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 799.[7]

**[9]** NDLON does not dispute the district court's holding that "it is virtually axiomatic that the City has a 'significant' interest in traffic flow and safety." 475 F. Supp. 2d at 964. Nor could it raise any serious challenge to this well-established principle. *See*, *e.g.*, *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997) (recognizing the government's substantial interest in "promoting the free flow of traffic on streets and sidewalks"); *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1022 (9th Cir. 2009) (recognizing "a somewhat greater governmental interest in regulating expressive activity on city streets because of the public safety concerns raised by vehicular traffic"). Thus, we agree with the district court that Redondo Beach has a substantial interest in promoting traffic flow and safety.

**[10]** We now consider whether the Redondo Beach ordi-

---

[7]The dissent loses sight of this rule when it states that Redondo Beach's asserted interests are equally furthered by existing traffic ordinances. Dissent at 8407-08. The question is not whether existing ordinances could advance the government's legitimate goals, but whether the ordinance at issue is substantially broader than necessary to achieve those goals. *Ward*, 491 U.S. at 799.

nance is narrowly tailored to serve this significant interest. A regulation may be narrowly tailored for First Amendment purposes even if it restricts more speech or conduct than is absolutely necessary. *See Hill*, 530 U.S. at 726 (holding that "when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal" (footnote omitted)); *Ward*, 491 U.S. at 798 (holding that "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so").

In *ACORN*, we determined that the Phoenix ordinance was "narrowly tailored to address legitimate traffic safety concerns." 798 F.2d at 1270. We agreed with Phoenix's determination that "[t]he distraction of motorists occasioned by solicitation not only threatens to impede the orderly flow of traffic, but also raises serious concerns of traffic and public safety." *Id.* at 1269. For example, we recognized "the evident dangers of physical injury and traffic disruption that are present when individuals stand in the center of busy streets trying to engage drivers." *Id.* (internal quotation marks omitted). We also noted that the solicitation of employment, business, or contributions demanding an immediate response from drivers was more disruptive to traffic flow than the "oral advocacy of ideas, or even the distribution of literature." *See id.* at 1268-69. Because the Phoenix ordinance aimed "at the disruptive nature of fund solicitation from the occupants of vehicles," *id.* at 1268, and not at "[d]irect communication of ideas, including the distribution of literature to occupants in vehicles," *id.*, we concluded that the Phoenix ordinance was narrowly drawn to address the government's legitimate concerns, *id.* at 1270.

**[11]** Redondo Beach, like Phoenix, contends that the key purposes of the ordinance are to avoid disruptions of traffic

and to address safety concerns. 475 F. Supp. 2d at 963. Our conclusion in *ACORN* that solicitation demanding an immediate response from drivers increases the risks of traffic disruption and injury is equally applicable to Redondo Beach. Nothing in the record suggests that solicitation for employment raises a less significant risk of disruption in traffic flow than solicitation for contributions. And, as in *ACORN*, we find that an ordinance prohibiting in-person demands requiring an immediate response from vehicle occupants, but allowing the distribution of literature to those same occupants, is narrowly tailored to meet traffic and safety concerns. *See ACORN*, 798 F.2d at 1268. We therefore hold that the Redondo Beach ordinance is narrowly tailored.

We disagree with the district court's decision that the Redondo Beach ordinance is distinguishable from the Phoenix ordinance because it "sweeps in a much larger amount of 'solicitation' speech and speech-related conduct than the ordinance at issue in *ACORN*." 475 F. Supp. 2d at 964. The district court based this conclusion on the ground that the Redondo Beach ordinance applied to individuals standing on the sidewalk, and could be broadly construed to reach an individual "who merely holds up a sign inviting the occupants of vehicles to drive to a private location to confer." *Id.* at 964-65.

**[12]** In *ACORN*, we construed the nearly identical Phoenix ordinance as prohibiting solicitation from the sidewalk. 798 F.2d at 1272-73. We noted that the Phoenix ordinance's prohibition of solicitation while persons were "on" the street, rather than "in" the street, applied "more generally to solicitation occurring in direct proximity to the street," including from sidewalks. *Id.* at 1269 n.9 (italics and internal quotation marks omitted); *see id.* at 1272-73. We also noted that the "apparent thrust" of the Phoenix ordinance was "to identify the prohibited target of such solicitation—the occupants of vehicles—rather than the location where such conduct occurs." *Id.* at 1269 n.9. Because both the Phoenix and Redondo Beach ordinances, as construed, prohibit solicitors'

in-person demands from the sidewalk to vehicles in the street, the district court erred in distinguishing the Redondo Beach ordinance from the Phoenix ordinance on this basis.

We also disagree with NDLON and the dissent's argument that we should disregard *ACORN* because in that case, we did not consider myriad hypothetical enforcement situations that suggest the ordinance applies more broadly than necessary for traffic safety and flow. *ACORN*'s conclusion regarding a substantially similar ordinance is binding on us, even when a party raises new arguments, absent an intervening en banc or Supreme Court opinion. *See United States v. Contreras*, 593 F.3d 1135, 1136 (9th Cir. 2010) (en banc) (per curiam) (holding that a three-judge panel cannot overrule prior decisions, even if those decisions failed to address arguments regarding the effect of intervening authority); *see also CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 128 S. Ct. 1951, 1961 (2008); *Miller*, 335 F.3d at 893. In addition, *ACORN* explicitly rejected an argument similar to NDLON's, namely "that Phoenix could have equally served its interests through a less restrictive means by prohibiting only solicitation that disrupted traffic." 798 F.2d at 1270. The argument failed because hypothetical examples of how the government could theoretically apply an ordinance to target "more than the exact source of the 'evil' it seeks to remedy," *ACLU II*, 466 F.3d at 796 n.13 (internal quotation marks omitted), are not sufficient to establish inadequate tailoring. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-50 (2008). For the same reason, NDLON's imaginary concerns that children selling lemonade or Girl Scouts selling cookies outside a school will be impacted by Redondo Beach's ordinance do not convince us that the ordinance is not narrowly tailored. *See Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984) ("[T]here must be a *realistic* danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." (emphasis added)).

Further, we reject NDLON's argument that *ACLU II* compels the conclusion that the Redondo Beach ordinance is not narrowly tailored. *ACLU II* held that Las Vegas's ordinance "targets a substantial amount of constitutionally protected speech that is not the source of the 'evils' it purports to combat." 466 F.3d at 796 n.13. The Redondo Beach ordinance does not suffer the same constitutional defect. Unlike the Las Vegas ordinance, it is not aimed at the speech component of solicitation, which might include "a substantial amount of constitutionally protected speech." *Id.* The Redondo Beach ordinance is aimed at the "acts" component of solicitation; it targets only in-person demands directed at occupants of vehicles, and thus specifically addresses traffic flow and safety, the evils Redondo Beach sought to combat.

Therefore, as indicated by *ACORN* and our subsequent cases, we conclude that the Redondo Beach ordinance is narrowly tailored to serve Redondo Beach's significant interests in traffic flow and safety.

## C

Third, we consider whether Redondo Beach's ordinance leaves open alternative avenues of communication. We addressed this issue in *ACORN* and concluded that the Phoenix ordinance met this criteria because it allowed the distribution of literature, even to occupants of vehicles, and also allowed a range of solicitation methods "including solicitation on the sidewalk from pedestrians, canvassing door-to-door, telephone campaigns, or direct mail." *ACORN*, 798 F.2d at 1271.

**[13]** We reach the same conclusion here. The alternative avenues of communication identified as adequate in *ACORN* are also available in Redondo Beach. As in *ACORN*, the Redondo Beach ordinance permits persons to solicit "business, employment, or contributions" from people on sidewalks or in similar public forums within Redondo Beach, so

long as the act does not take place when the target of the solicitation is actually driving in the street.**⁸** *See id.* Prospective employers or contributors can park legally and respond to solicitations made by individuals on foot without either party to the transaction violating the ordinance. Therefore, the ordinance does not require solicitors to resort to substitutes like advertising in phone books, newspapers, or by mail, which may require longer lead times and greater financial resources. *See Long Beach Area Peace Network*, 574 F.3d at 1025 (noting that "we consider the cost and convenience of alternatives" as one factor in the ample alternatives analysis).

The district court held that the alternative avenues of communication identified by Redondo Beach were inadequate because they were not as commercially viable or effective as solicitation in the street. 475 F. Supp. 2d at 967-68. But alternative means of expression need not be as effective as the restricted means, so long as the message itself can still reach the intended audience. *See One World One Family Now*, 76 F.3d at 1014-15 (holding that a Honolulu ordinance banning the sale of merchandise in city streets left open ample alternative channels because the ordinance allowed the plaintiffs to express their message to the intended audience through "handing out literature, proselytizing or soliciting donations," as well as giving away t-shirts, wearing t-shirts bearing their message, and "sell[ing] [t]-shirts through local retail outlets or by opening their own stores"); *see also ACORN*, 798 F.2d at 1271 (upholding a restriction on ACORN's "uniquely effective method of fundraising"). For instance, we held that a restriction which had the effect of banning protests in "a portion of [Seattle]'s downtown area where protestors could not deliver their message directly to [the World Trade Organization] delegates" left open ample alternative channels of com-

---

**⁸**Because the Redondo Beach ordinance leaves open ample alternative channels irrespective of the availability of local shopping centers for solicitation, we do not address the parties' arguments regarding shopping centers' status as public fora under federal and California law.

munication because the protestors could make their protests "visible and audible to delegates, even if not as proximate as the protestors might have liked." *Menotti v. City of Seattle*, 409 F.3d 1113, 1138 (9th Cir. 2005). While the challenged restrictions "were perhaps not ideal for protestors who wanted to present views in the face of delegates," *id.* at 1141, we confirmed that "there is no authority suggesting that protestors have an absolute right to protest at any time and at any place, or in any manner of their choosing," *id.* at 1138-39.

We have struck down ordinances for failure to provide alternative means of expression only when they effectively prevent a message from reaching the intended audience. Thus, in *Edwards v. City of Coeur d'Alene*, 262 F.3d 856 (9th Cir. 2001), we invalidated an ordinance banning picket signs carried during parades and public assemblies. *Id.* at 860. Because the intended audience was "spectators, passersby, and television cameras stationed a good distance away," we concluded that the alternative channels of communication suggested by the city, including "shouting, singing, holding a sign in his hands, or leafleting," would not enable the speaker to reach the intended audience. *Id.* at 867. "As a general rule, parades and public assemblies involve large crowds and significant noise," making it "difficult to see more than a few feet in any direction, or to hear anyone who isn't standing nearby." *Id.* Under these circumstances, we held that there was "*no* other effective and economical way for an individual to communicate his or her message to a broad audience." *Id.* (emphasis added).

**[14]** Unlike *Edwards*, Redondo Beach has not banned the only effective means to communicate with prospective employers, who can be reached in safer and less disruptive ways than by soliciting drivers in the street. As we have already explained, employment seekers can reach their audience of potential employers by other means. *See supra* at 8377-78. Accordingly, Redondo Beach has met its burden of

demonstrating that the ordinance leaves open ample alternative avenues of communication.

IV

Although the Redondo Beach ordinance is a valid time, place, and manner restriction, NDLON argues that the Redondo Beach ordinance is nevertheless invalid due to vagueness. Specifically, NDLON argues that the ordinance is unconstitutionally vague because it fails to provide adequate notice of what it prohibits and, as a result, chills the speech of advocacy groups.

**[15]** As the Supreme Court has explained, "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A vague enactment may be void for any of three reasons: (1) it fails to give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited"; (2) it "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application"; or (3) "where a vague statute abut(s) upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms." *Id.* (internal quotation marks omitted).

NDLON locates the Redondo Beach ordinance's vagueness in its failure to define the words "solicit," "attempt to solicit," "contributions," and "business." Because of this lack of definition, NDLON asserts that the ordinance offers no guidance to day laborers as to whether they can "stare at cars on the roadway, or approach safely stopped vehicles." NDLON states that "[a]dvocacy organizations are left to assume that leafleting parked cars, as well as carrying large signs that are directed at pedestrians but visible to passing drivers" are banned by the ordinance. Moreover, NDLON argues that the ordinance lacks guidance as to whether saying the words,

"Support Our Cause!" or "Volunteer for Our Organization!" constitutes requests for contributions or employment, and thus "individuals must watch what they say or risk going to jail."

We cannot invalidate an ordinance for vagueness based on these sorts of hypertechnical, imaginative interpretations and hypothetical concerns. In *Hill*, the Supreme Court rejected a similar vagueness challenge to a statute restricting the undefined terms "protest, education, or counseling," near a health care facility. 530 U.S. at 732. The Court stated:

> Petitioners proffer hypertechnical theories as to what the statute covers, such as whether an outstretched arm constitutes "approaching." And while "[t]here is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question," because we are "[c]ondemned to the use of words, we can never expect mathematical certainty from our language" . . . . We thus conclude that "it is clear what the ordinance as a whole prohibits." More importantly, speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid "in the vast majority of its intended applications."

*Id.* at 733 (citations and footnote omitted). Our subsequent cases have rejected similar vagueness challenges to undefined, yet commonly understood terms. *See*, *e.g.*, *Gospel Missions of Am. v. City of L.A.*, 419 F.3d 1042, 1047-48 (9th Cir. 2005) (rejecting a vagueness challenge to the terms "charitable" and "charitable purpose," and citing cases rejecting other speculative vagueness challenges); *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1151-53 (9th Cir. 2001) (noting "that 'instruction' and 'curriculum' are words of common understanding," and citing cases).

In addition, "otherwise imprecise terms may avoid vagueness problems when used in combination with terms that pro-

vide sufficient clarity." *Gammoh v. City of La Habra*, 395 F.3d 1114, 1120 (9th Cir. 2005). For example, in *Gammoh*, the ordinance at issue required that adult cabaret dancers perform at least two feet from their patrons. 395 F.3d at 1118. We rejected appellants' vagueness challenge to the ordinance's definition of "adult cabaret dancer," because even though the statute's definition of "adult cabaret dancer" contained subjective terms, the prohibited activity was defined objectively. *See id.* at 1120. The clarity of the language defining where activities were prohibited provided adequate notice of what kind of acts were within the scope of the statute. Because "it [was] not illegal to be an adult cabaret dancer[,] only to be an adult cabaret dancer performing within two feet of a patron," we held that the ordinance was "certainly not vague." *Id.*

**[16]** The same analysis is applicable here. The acts proscribed by the Redondo Beach ordinance are no less clear "in the vast majority of its applications," *Hill*, 530 U.S. at 732, than the activities proscribed by the statute in *Hill* or other cases rejecting facial vagueness challenges. The ordinance provides "a person of ordinary intelligence fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 128 S. Ct. 1830, 1845 (2008). In the context of the ordinance as a whole, it is clear that the ordinance prevents acts of solicitation that risk interfering with the flow of traffic. Therefore, it is not reasonable to read the ordinance as preventing day laborers from staring at or approaching legally parked cars, carrying signs, or shouting slogans.

NDLON also argues that people may read the word "solicitation" as banning the distribution of literature requesting donations or employment. We are doubtful that this is a realistic concern. The ordinance as a whole is aimed at uniquely disruptive activities that cause traffic congestion, which would ordinarily not include the unilateral distribution of leaflets. *See ACORN*, 798 F.2d at 1268. Further, the subsection of the ordinance prohibiting drivers from hiring people on the

street indicates that the ordinance targets transactions requiring a response, and not the distribution of literature.

**[17]** Even if the meaning of the word "solicitation" were not completely clear based on the context, any residual vagueness would be dispelled by Redondo Beach's construction of the ordinance, as well as our interpretation of the substantially similar ordinance in *ACORN*. *See Berger*, 569 F.3d at 1040 n.6 (indicating that an ordinance of questionable constitutionality—a permit requirement that applied to an individual speaker—was saved by narrowing constructions in a county executive order and a judicial interpretation). For a vagueness challenge, "we must consider the City's limiting construction of the ordinance." *Foti*, 146 F.3d at 639; *see Cal. Teachers Ass'n*, 271 F.3d at 1151 (indicating that a statute's vagueness does not exceed constitutional limits if it is subject to a narrowing construction). As we have explained, *see supra* part III.A., Redondo Beach's ordinance prohibits in-person demands requiring an immediate response from drivers in traffic lanes, not the distribution of literature to drivers. Therefore the ordinance's use of the word "solicit" does not make the ordinance unconstitutionally vague.

Nor do we agree with NDLON's argument that the ordinance is impermissibly vague because it invites arbitrary or discriminatory enforcement. The undefined terms in the ordinance do not require "wholly subjective judgments without . . . narrowing context, or settled legal meanings." *Williams*, 128 S. Ct. at 1846. Whether a person is engaged in the act of soliciting contributions, business, or employment from the occupant of a vehicle (or whether the occupant of a vehicle is responding to the same) requires "a true-or-false determination, not a subjective judgment such as whether conduct is 'annoying' or 'indecent.' " *Id.* Without this subjectivity, there is less "danger that a police officer might resort to enforcing the ordinance only against [speakers] whose *messages* the officer or the public dislikes." *Foti*, 146 F.3d at 639 (emphasis added).

V

Finally, we consider the dissent's argument that *ACORN* cannot guide our analysis of NDLON's facial challenge to Redondo Beach's ordinance because it considered only an as-applied challenge to the Phoenix ordinance and should be confined to its facts. Dissent at 8399-8400. Contrary to the dissent's assertion, *ACORN* considered and rejected an overbreadth challenge to the Phoenix ordinance. 798 F.2d at 1272. After explaining that the overbreadth doctrine allows parties "whose own conduct may be unprotected" to challenge broadly written statutes that might deter protected conduct of third parties, *id.* (internal quotation marks omitted), we considered *ACORN*'s argument that "even if its 'tagging' of vehicles stopped at intersections is unprotected, the Phoenix ordinance may be challenged on its face as overbroad because its prohibition extends further to solicitation on the sidewalks of Phoenix, during parades or demonstrations, or on streets closed to vehicle traffic," *id.* We rejected ACORN's argument that the ordinance would deter a range of hypothetical activities by third parties because those theories ran "completely contrary to the language of the ordinance," *id.* at 1273, which we construed as prohibiting "only solicitation in the streets from the occupants of any vehicle," *id.* at 1272 (internal quotation marks omitted). For this reason, we held that "[t]he ordinance is sufficiently narrow to withstand an overbreadth challenge." *Id.* at 1273. *ACORN* requires us to construe the substantially identical Redondo Beach ordinance in the same manner.

Even if *ACORN* did not address an overbreadth challenge, as a matter of logic, *ACORN*'s validation of Phoenix's statute poses a high barrier to a facial challenge of any similar ordinance. As the Supreme Court has recently explained, to succeed in "a typical facial attack," a plaintiff must establish "that no set of circumstances exists under which [the challenged ordinance] would be valid, or that the statute lacks any plainly legitimate sweep." *United States v. Stevens*, 130 S. Ct.

1577, 1587 (2010). The bar is lower in the First Amendment context, however, where "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (internal quotation marks omitted). Even under this less stringent standard, it is unclear how NDLON could establish that the Redondo Beach ordinance is invalid in a substantial number of its applications when we have already held that the Phoenix ordinance is constitutional in the range of applications identified in *ACORN*. *See ACORN*, 798 F.2d at 1273. Although our decision in *ACORN* would not preclude NDLON from arguing that the Redondo Beach ordinance was unconstitutional as applied to its members' solicitations, NDLON does not bring such an as-applied challenge here.

VI

**[18]** We therefore hold that Redondo Beach's ordinance sweeps no more broadly than the Phoenix ordinance in *ACORN*. Under *ACORN*, and subsequent cases affirming *ACORN*'s central holding, we hold that the Redondo Beach ordinance is a reasonable time, place, or manner restriction. The district court erred in determining that it was not bound by *ACORN*, and as a result erred in holding that the Redondo Beach ordinance was not narrowly tailored and did not leave open ample alternative channels of communication. We also hold that the Redondo Beach ordinance is not unconstitutionally vague. Because we reverse the district court's summary judgment in favor of appellees and hold that appellants are entitled to summary judgment in their favor, we reverse the district court's award of attorneys' fees to appellees.

**REVERSED.**

WARDLAW, Circuit Judge, dissenting:

I respectfully dissent from the majority's holding that the Redondo Beach ("City") ordinance is a valid time, place, and

manner restriction upon speech occurring on the City's sidewalks and other public ways—the most traditional of public fora. In the words of Redondo Beach City Attorney Gordon C. Phillips, who recommended the ordinance's adoption to the City's Mayor and Council Members, the ordinance "prohibits any person from soliciting from the street 'employment, business or contributions' from occupants of vehicles." The ordinance is facially overbroad and thus violates well-established principles of our First Amendment jurisprudence.

Nor is the ordinance "readily susceptible" to the majority's cramped reading of it as a mere prohibition of "direct, in-person demands requiring an immediate response from drivers in traffic lanes." Not even the City has urged this narrow construction of the ordinance. To the contrary, the City argues that the ordinance permits in-person demands directed at drivers who then stop at parking lots. Moreover, the "aim" of the ordinance, and the manner in which the City has selected to enforce it, are simply not relevant considerations when analyzing a claim of facial overbreadth, as the Supreme Court recently reaffirmed in *United States v. Stevens*. *See* 130 S. Ct. 1577, 1591 (2010). The majority inappropriately clings to its subjective and selective interpretation of our opinion in *ACORN v. City of Phoenix*, 798 F.2d 1260 (9th Cir. 1986), as fragile life support for its conclusion. The *ACORN* decision, however, is an inapposite as-applied solicitation case that the district court here and *all* of our subsequent authority, including our recent en banc decision in *Berger v. City of Seattle*, 569 F.3d 1029 (9th Cir. 2009), have limited to its facts. *ACORN* holds only that the Phoenix ordinance is constitutional as applied to the invasive practice of "tagging"; the question of constitutional facial overbreadth was not even before our court on appeal, and the argument that the *ACORN* court did address under the misnomer of facial overbreadth was ACORN's claim that the ordinance was overbroad because there were some locations in Phoenix where ACORN —as opposed to third parties not before the court—might safely "tag."

Finally, the majority improperly dispenses with the bedrock principles underlying the protection of speech in a traditional public forum which limit restrictions on protected speech to those narrowly tailored to achieve significant government interests and leaving open alternative avenues of communication. The Redondo Beach ordinance fails to meet this standard. I would therefore affirm the district court's judgment that the ordinance is a facially overbroad, unconstitutional restriction on speech and the award of attorneys' fees to Appellees.

I.

On any given day in the State of California, 40,000 individuals are either employed as day laborers or are seeking day labor jobs. *See* Arturo Gonzalez, *Day Labor in the Golden State*, Cal. Econ. Pol'y, July 2007, at 1. Known in Spanish as "jornaleros," day laborers frequently serve as independent contractors and perform a variety of services, including gardening, housekeeping, and construction. Because of the temporary, informal nature of their employment, day laborers must forgo more traditional forms of advertising to signal their availability for work. Instead, to offer themselves for employment, they must congregate in a visible public place known to potential employers. This visibility has made day laborers the target of local regulators, often because of a perception that they pose a threat to public safety or that they are undocumented immigrants. *Id.*

The congregation of day laborers on public sidewalks spurred the City to enact Municipal Code § 3-7.1601 in 1987 ("Ordinance"). The Ordinance provides:

> (a) It shall be unlawful for any person to stand on a street or highway and solicit, or attempt to solicit, employment, business, or contributions from an occupant of any motor vehicle. For purposes of this section, "street or highway" shall mean all of that

area dedicated to public use for public street pur-
poses and shall include, but not be limited to, road-
ways, parkways, medians, alleys, sidewalks, curbs,
and public ways.

Two years later, the City enacted subsection (b), which pro-
vides:

(b) It shall be unlawful for any person to stop, park
or stand a motor vehicle on a street or highway from
which any occupant attempts to hire or hires for
employment another person or persons.

According to the City Attorney, the Ordinance was enacted in
response to complaints from local residents and business own-
ers about day laborers gathering along city streets and congre-
gating on sidewalks. They complained that the day laborers
impeded the flow of traffic, littered, damaged property, and
harassed females.

In recent years, the Ordinance has been enforced aggres-
sively by the Police Department, which concluded that verbal
and written warnings to day laborers and their potential
employers were ineffective, due mostly to the lack of any
follow-up enforcement. As a result, in October and November
2004, the police launched a sweeping sting operation called
the "Day Labor Enforcement Project." The police conducted
the sting operation in three phases, covering various hours of
the day during which day laborers congregated. Undercover
police officers posing as employers offered employment to
the assembled day laborers and arrested those who accepted.
*Comite de Jornaleros de Redondo Beach v. City of Redondo
Beach*, 475 F. Supp. 2d 952, 955 (C.D. Cal. 2006). The opera-
tion ultimately netted around sixty arrests. Those arrested and
convicted of violating the Ordinance received three years of
probation, a 180 day suspended sentence, a $314.00 booking
fee, and were enjoined to stay 150 yards away from the public
sidewalk where they were arrested. The Ordinance has thus

prohibited day laborers in the City from engaging in solicitation signaling their availability for work, and, effectively, from obtaining employment.

Two unincorporated day laborer associations, Comite de Jornaleros de Redondo Beach ("Jornaleros") and the National Day Laborer Organizing Network ("NDLON") filed suit in the Central District of California seeking monetary, injunctive, and declaratory relief on the grounds that the Ordinance violates their day laborer members' right to free speech under the First and Fourteenth Amendments.[1] The district court preliminarily enjoined the City from enforcing the Ordinance or

---

[1]Day laborers comprise Jornaleros's and NDLON's membership. Both associations exist to protect and advance the interests of day laborers—a goal that is unquestionably hampered by the Redondo Beach ordinance. Thus, I agree with the district court's ruling that Plaintiffs have standing to pursue their constitutional challenge.

Although I agree that NDLON and Jornaleros have standing, the majority gives Redondo Beach's standing argument short shrift. Redondo Beach argues that plaintiffs cannot "satisfy the *Lujan* test for standing because plaintiffs have not demonstrated a legally protected interest—i.e., the legal right to work in the United States." The City asserts that "plaintiffs are soliciting the commission of a crime by the prospective employers (hiring an illegal alien) and they seek to commit a crime of their own (working in the United States without a legal right to do so)." Redondo Beach contends that "[j]ust as state laws against prostitution and drug dealing are not open to challenge by those who seek to violate them, day laborers who are soliciting work without the legal right to work in the United States have no standing to challenge Redondo Beach's anti-solicitation ordinance." The City's underlying assumption is that all day laborers are "illegal aliens," and are therefore criminally prohibited from seeking jobs in the United States. This assumption, however, is neither supported by the facts of this case nor the law. But even if the City's prejudgment as to the day laborers' immigration status were correct, it is legally beside the point. The First Amendment protects individuals, regardless of their immigration status. *Am-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1063-64 (9th Cir. 1995), *rev'd on other grounds*, 525 U.S. 471 (1999); *see also Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments.").

any violations of probation following convictions under the Ordinance, and it mandated continuances of any ongoing prosecutions. *Comite*, 475 F. Supp. 2d at 956. The City appealed the grant of the preliminary injunction and a three-judge panel of our court unanimously affirmed. *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 127 F. App'x 994 (9th Cir. 2005). The parties then filed cross-motions for summary judgment on the facial constitutionality of the Ordinance. The district court ruled that although the Ordinance is content neutral, it is unconstitutionally over-broad. The district court specifically rejected the City's contention that our opinion in *ACORN v. City of Phoenix* was controlling precedent, correctly determining that *ACORN* involved an "as-applied" challenge and was otherwise distinguishable on its facts. *Comite*, 475 F. Supp. 2d at 964-65.

Concluding that the Ordinance was not narrowly tailored to achieve the City's significant interests in traffic flow and safety, and finding that the City presented no evidence of an available alternative means of communication, the district court determined that the Ordinance is not a valid time, place, or manner restriction on speech. *Id.* at 968. The court permanently enjoined the City from enforcing the Ordinance, and this appeal ensued. *Id.*

## II.

The First Amendment fully protects solicitation. *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 628-32 (1980); *Berger*, 569 F.3d at 1050. As we have stated, "It is beyond dispute that solicitation is a form of expression entitled to the same constitutional protections as traditional speech." *ACLU v. City of Las Vegas* (*ACLU II*), 466 F.3d 784, 792 (9th Cir. 2006). Solicitation "is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes." *Vill. of Schaumburg*, 444 U.S. at 632. Without it, "the flow of such information and advocacy would likely cease." *Id.* The protection afforded

solicitation is not reduced simply because the solicitor seeks to have an individual contribute money. *See Bates v. State Bar of Arizona*, 433 U.S. 350, 363 (1977). Because solicitation requires effective access to the public, "[r]ules that regulate solicitation in public fora are . . . subject to the same standards as those that limit other forms of speech." *Berger*, 569 F.3d at 1050; *see also ACLU II*, 466 F.3d at 792 ("It is beyond dispute that solicitation is a form of expression entitled to the same constitutional protections as traditional speech."). Therefore, the Ordinance burdens fully protected speech in traditional public fora.

Nonetheless, the majority characterizes the Ordinance as regulating only conduct. This is not the case; it plainly "prohibits any person from soliciting from the street 'employment, business, or contributions' from occupants or vehicles," as the City Attorney describes it. Our case law holds that such bans on solicitation are bans on speech. In *Berger*, our court, sitting en banc, confronted a regulation that prevented street performers from "actively solicit[ing] donations, for example by live or recorded word of mouth, gesture, mechanical devices, or second parties." 569 F.3d at 1050. We explicitly rejected the city's contention that this provision merely regulated conduct, finding instead that it regulated speech by seeking to restrict the "medium and manner" of that speech. *Id.* at 1051. Here, too, the Ordinance's text does not prohibit conduct, such as the immediate transfer of funds. Rather, just like the active solicitation ban in *Berger*, the Ordinance regulates the "medium and manner" of protected speech.

Worse, the prohibition on protected speech operates exclusively on the public streets and sidewalks of Redondo Beach quintessential public fora. *Berger*, 569 F.3d at 1036 & n.3; *ACLU v. City of Las Vegas* (*ACLU I*), 333 F.3d 1092, 1099 (9th Cir. 2001); *see also United States v. Grace*, 461 U.S. 171, 177 (1983). Public streets are public fora by their very nature; no governmental action designating them as such is required. *Grace*, 461 U.S. at 177; *see also U.S. Postal Serv.*

*v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 133 (1981) ("Congress, no more than a suburban township, may not by its own *ipse dixit* destroy the 'public forum' status of streets and parks . . . ."). Streets and other public fora "occup[y] a special position in terms of First Amendment protection." *Grace*, 461 U.S. at 180.

This "special position" of traditional public fora is the product of more than a century of Supreme Court precedent, and it is now well established. Dicta by Justice Roberts in *Hague v. Committee for Industrial Organization*, 307 U.S. 496 (1939), first articulated a view of traditional public fora that exalted the individual's right to speak and assemble over the state's proprietary interest. The *Hague* Court invalidated a city ordinance requiring a permit for any public parade or assembly "in or upon the public streets, highways, public parks or public buildings." *Id.* at 503 n.1. Justice Roberts, writing for himself and Justice Black, famously wrote:

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

*Id.* at 515. Under this view, the existence of traditional public fora is inextricably intertwined with their historical status as places for important expressive activity. This dicta ultimately established a First Amendment easement, allowing individuals to commandeer public fora for expressive purposes. Harry Kalven, Jr., *The Concept of the Public Forum:* Cox v. Louisiana, 1965 UCLA L. Rev. 1, 12-13. It has become an unassailable principle of the First Amendment and is the foundation of the modern public fora doctrinal framework. *See, e.g.*, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S.

37, 45 (1983); *Kunz v. New York*, 340 U.S. 290, 293-94 (1951); *Jamison v. Texas*, 318 U.S. 413, 415 (1943). Consequently, in *Berger*, our most recent exegesis on the subject, we recognized the "bedrock principle" that the "protections afforded by the First Amendment are nowhere stronger than in streets and parks." *Berger*, 569 F.3d at 1035-36 (footnote omitted).

The government's power to pass laws, regulations, or ordinances affecting speech in these areas is therefore strictly limited. *Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1132 (2009); *see also Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 761 (1995) ("[A] State's right to limit protected expressive activity [in a traditional public fora] is sharply circumscribed . . . ."). This is not a jurisprudential accident; as places where individuals may express themselves without regard to the resources of the speaker or popularity of the message, traditional public fora serve as the main bulwark of the First Amendment. *See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 708 (1992) (Kennedy, J., concurring) ("One of the primary purposes of the public forum is to provide persons who lack access to more sophisticated media the opportunity to speak."); *cf.* Kalven, *supra*, at 12. Whether the First Amendment is viewed as a means for pursuing truth or ensuring self-expression,[2] meaningful access

---

[2]For example, Professor Martin Redish construes the First Amendment as ultimately serving the principle of "individual self realization"—the ability of individuals to realize their full potential and the goals they have set for their lives. *See generally* Martin H. Redish, *The Value of Speech*, 130 U. Pa. L. Rev. 591 (1982). Alexander Meiklejohn viewed the First Amendment as aiding individuals in making the informed decisions critical for self-government. *See* Alexander Meiklejohn, Political Freedom 24-28 (1960). Perhaps most famously, John Stuart Mill argued that a "marketplace of ideas" was required insofar as "[c]omplete liberty of contradicting and disproving our opinion is the very condition which justifies us in assuming its truth for purposes of action." John Stuart Mill, On Liberty 11 (Longmans, Green, & Co. 1921) (1859). Broad access to traditional public fora directly advances each of these asserted interests.

to society is fundamental. *See* Thomas I. Emerson, The System of Freedom of Expression 305-06 (1970). Thus, open access to traditional public fora guarantees the continued vitality of the First Amendment, especially in light of the growing privatization of many traditional public fora. *See PruneYard Shopping Center v. Robins*, 447 U.S. 74, 90-91 (1980) (Marshall, J., concurring).

Of course, individuals' First Amendment rights on public ways are not absolute; the government has the authority to pass reasonable time, place, or manner restrictions. To pass constitutional muster, however, the government must demonstrate that the regulation is " 'justified without reference to the content of the regulated speech, that [it is] narrowly tailored to serve a significant governmental interest, and that [it] leave[s] open ample alternative channels for communication of the information.' " *Lee v. Katz*, 276 F.3d 550, 557 (9th Cir. 2002) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1981)). When applying this test, courts must not lose sight of the core constitutional liberties that are implicated. Freedom of speech is one of the "fundamental personal rights and liberties" guaranteed the public; this characterization "is not an empty one and [is] not lightly used." *Schneider v. New Jersey*, 308 U.S. 147, 161 (1939). The fundamental nature of the right "stresses . . . the importance of preventing the restriction of enjoyment of these liberties." *Id.* When the government infringes the public's fundamental right to assemble and speak, courts must approach the regulation skeptically and place the onus squarely on the government to justify the enacted regulation. *Cf. Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1022 (9th Cir. 2009) (" 'Public fora have achieved a special status in our law; the government must bear an extraordinarily heavy burden to regulate speech in such locales.' " (quoting *NAACP v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir. 1984)).

The City has failed to meet this heavy burden. Subsection (a) of the Ordinance is a total ban on speech in traditional

public fora, while subsection (b) prohibits persons in even lawfully parked cars from hiring, or attempting to hire, anyone for employment. On its face, the Ordinance sweeps far more broadly than what is justified by the City's interests in traffic flow and safety, and it does not leave open ample alternatives for communication.[3] Ignoring the full body of jurisprudence governing speech in public fora, the majority seizes upon one inapposite decision of our court, in which we addressed an as-applied challenge to a similar ordinance, to hold the Ordinance constitutional.

A.   ACORN v. City of Phoenix *Does Not Apply to, Much Less Control, this Appeal*.

The majority opinion rests entirely on *ACORN v. City of Phoenix* to conclude that the Ordinance is a valid time, place, or manner regulation. The *ACORN* court, however, confronted a very specific, narrow set of circumstances to which the parties in that case stipulated and to which we have subsequently confined it. Thus, the *ACORN* decision does not control this case.

In *ACORN*, the Association of Community Organizations for Reform Now ("ACORN") claimed that a Phoenix ordinance restricting solicitation infringed its First Amendment rights. ACORN engaged in a practice referred to as "tagging" as part of its effort to raise funds for promoting the concerns of low and moderate income citizens. *ACORN*, 798 F.2d at 1262. Phoenix officials specifically warned ACORN that its practice of tagging violated the city ordinance prohibiting an individual from "stand[ing] on a street or highway and solicit[ing], or attempt[ing] to solicit, employment, business or contributions from the occupants of any vehicle." *Id.* ACORN then instituted a civil rights action in federal district court,

---

[3]For present purposes, I assume that the district court's conclusion that the regulation is content neutral is correct. However, this is a closer question than it appears. *See Berger*, 569 F.3d at 1051.

seeking damages pursuant to 42 U.S.C. § 1983 and a declaratory judgment that the ordinance was either inapplicable to its tagging practice or unconstitutional. *Id.* Before the district court, the *ACORN* parties entered into a stipulation, which, among other things, agreed to the precise conduct at issue*:*

> Within the City of Phoenix, various of the plaintiffs have implemented . . . various fund solicitation and information dissemination programs . . . . Said programs are commonly known as 'tagging,' which usually involves an individual stepping into the street and approaching a car when it is stopped at a red light. The individual asks for a contribution to his/her cause, and when such a contribution is given, the solicitor gives the contributor a slip of paper providing information concerning his/her cause, —e.g., where and how to participate in the cause, how to become involved further, and so forth.

Pretrial Order at 3, *ACORN v. City of Phoenix*, 603 F. Supp. 869 (D. Ariz. 1985) (No. 83-870) (emphasis added). The district court found that the ordinance was constitutional *as applied* to ACORN's practice of soliciting contributions by tagging. *See ACORN*, 603 F. Supp. at 872.

We agreed that the ordinance was constitutional as applied to ACORN's tagging practices as defined by the parties. We held that the "Phoenix ordinance is aimed narrowly at the disruptive nature of fund solicitation from the occupants of vehicles. Direct communication of ideas, including the distribution of literature to occupants in vehicles, is not restricted." *ACORN*, 798 F.2d at 1268. Our decision focused exclusively on the disruption to drivers temporarily stopped on the road in the midst of traffic and to the flow of traffic itself caused by persons stepping into the street seeking an immediate contribution of money from the driver:

> Unlike oral advocacy of ideas, or even the distribution of literature, successful solicitation requires the

individual to respond by searching for currency and passing it along to the solicitor. Even after the solicitor has departed, the driver must secure any change returned, replace a wallet or close a purse, and then return proper attention to the full responsibilities of a motor vehicle driver.

*Id.* at 1269. The majority takes this quote out of context to support its broader reading of the *ACORN* decision to uphold bans on all types of solicitation. Read properly, however, *ACORN* focused entirely on the practice of in-person, immediate demands for funds in the street that actually disrupt the driver from continuing on.

Contrary to the majority's assertion, the ordinance we upheld in *ACORN* and the City's Ordinance differ in critical respects. The Phoenix ordinance involved in *ACORN* prohibited "solicitation" only by people who were standing in a street or highway. It provided:

No person shall stand on a street or highway and solicit, or attempt to solicit, employment, business or contributions from the occupants of any vehicle.

*ACORN*, 798 F.2d at 1262 (quoting Phoenix City Ordinance § 36-101.01). By contrast, and despite the majority's strained efforts to limit it, the City's Ordinance sweeps far more broadly. First, the Phoenix ordinance applied only to solicitation on streets and highways. The Redondo Beach Ordinance applies to "all of that area dedicated to public use for public street purposes and shall include, but not be limited to, roadways, parkways, medians, alleys, sidewalks, curbs, and public ways." Redondo Beach Municipal Code § 3-7.1601(a). The *ACORN* decision itself recognized the greater importance of sidewalks to expressive activity, reasoning:

As a practical matter, there are indeed substantial differences in nature between a street, kept open to

motorized vehicle traffic, and a sidewalk or public park. A pedestrian ordinarily has an entitlement to be present upon the sidewalk or on the grounds of a park and thus is generally free at all times to engage in expression and public discourse at such locations. This is obviously not true of streets continually filled with pulsing vehicle traffic. Consequently, more so than with sidewalks or parks, courts have recognized a greater governmental interest in regulating the use of city streets.

*ACORN*, 798 F.2d at 1267. Second, the Ordinance contains subsection (b), which covers an entire category of individuals —potential employers—that the Phoenix ordinance left unregulated. The City provides no justification for prohibiting willing listeners from lawfully stopping their vehicles for the purpose of lawfully "hir[ing] for employment another person or persons." Given its greater breadth in terms of where and to whom it applies, the City's Ordinance "sweeps in a much larger amount of 'solicitation' speech and speech-related conduct than the ordinance at issue in *ACORN*" and the holding as to the narrower statute does not control our review of the broader.[4] *Comite*, 475 F. Supp. 2d at 964-65.

Our court has also subsequently made clear the narrow reach of the *ACORN* decision. In *ACLU II*, we construed *ACORN* as upholding "a ban on in-hand solicitation from automobiles." 466 F.3d at 794. More recently, sitting en banc, we explicitly rejected the expansive reading of *ACORN* by the majority here, concluding that it only upheld a prohibition on "the immediate physical exchange of money." *Berger*, 569

---

[4]It is of no import that the City Attorney attempted to craft an ordinance modeled on the Phoenix ordinance at issue in *ACORN*. The City obviously failed to do so, and no amount of back-pedaling—short of amending the Ordinance—can fix it now. By its plain terms the Redondo Beach Ordinance reaches much more First Amendment protected expression than did the Phoenix ordinance.

F.3d at 1052 n.23. A careful reading of the *ACORN* decision itself, as well as our subsequent interpretation of its holding, make clear that it upheld the constitutionality of a narrower ordinance only as applied to a highly invasive form of solicitation on the streets for an immediate exchange of funds that actually disrupted traffic.

The majority belatedly suggests that *ACORN* presented a facial overbreadth challenge to the Phoenix ordinance. The district court had rejected this challenge as untimely, *see ACORN*, 603 F. Supp. at 872, but our court allowed ACORN to make its "overbreadth" argument because it agreed with the trial court's conclusion (after trial) that "there was no evidence to suggest that the Phoenix ordinance curtailed any activity other than solicitation from vehicles at an intersection." *ACORN*, 798 F.2d at 1272. Although our court labeled this challenge as one of facial overbreadth, the argument ACORN actually made was not the type of facial challenge we recognize in the First Amendment context. As the Court said in *Stevens*, "In the First Amendment context . . . this Court recognizes 'a second type of facial challenge,' whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.' " 130 S. Ct. at 1587 (quoting *Wash. St. Grange v. Wash. St. Republican Party*, 552 U.S. 442, 449 n.6 (2008)). In the First Amendment area litigants "are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

ACORN's briefs on appeal to our court demonstrate that its so-called "facial challenge" was not what we have long considered a First Amendment overbreadth challenge. All that ACORN argued was that the Phoenix ordinance regulated its own tagging activity "too broadly." Plaintiff-Appellants'

Reply Brief at 18, *ACORN v. City of Phoenix*, 798 F.2d 1260 (No. 85-1810). The City of Phoenix, in its own reading of *ACORN*, also recognized ACORN's argument for what it was —a simple argument that the ordinance "seeks to prohibit 'tagging' not just on the roadway, but also on sidewalks and other 'safe' locations."**5** Brief of Appellees at 13, *ACORN v. City of Phoenix*, 798 F.2d 1260 (No. 85-1810). No "speech" other than tagging was at issue; no other party's interests but ACORN's were asserted.

By contrast, the plaintiffs here make only a First Amendment facial overbreadth challenge to the Ordinance. Therefore, neither *ACORN*'s as-applied holding nor its so-called overbreadth holding is applicable, much less controlling. We must find the Redondo Beach Ordinance unconstitutional if a danger exists that the Ordinance will "significantly compromise recognized First Amendment protections of parties not before the Court." *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984); *see also ACLU II*, 466 F.3d at 790 n.9 ("'Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court.' " (quoting *Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984))). This inquiry requires us to look beyond the application in the present case and examine the potential scope of the statute because " '[t]he threat of sanctions may deter [speech] almost as potently as the actual

---

**5**The *ACORN* panel dismissed this argument as "simply represent[ing] a misreading of the Phoenix ordinance. The ordinance does not prohibit all solicitation even in the streets. It prohibits only solicitation in the streets 'from the occupants of any vehicle.' " *ACORN*, 798 F.2d at 1272. To the extent language in the ACORN opinion purports to consider a "facial overbreadth" argument that is anything other than the tagging rights ACORN asserts, it is obviously dicta. *See Espinosa v. United Student Aid Funds, Inc.*, 553 F.3d 1193, 1199 n.3 (9th Cir. 2008) ("Anything [a prior case] has to say as to matters not presented in that case is, in any event, dicta and thus not binding on us.").

application of sanctions. Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.' " *IDK, Inc. v. Clark County*, 836 F.2d 1185, 1190 (9th Cir. 1988) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)); *see also Broadrick*, 413 U.S. at 611-12 ("It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society.").

However, even if plaintiffs had brought an as-applied challenge, their solicitation of employment could not be more distinct from conduct causing immediate disruption of traffic flow. As the City itself argues, "*ACORN* addressed the application of an essentially identical ordinance to people who went into the street to solicit cars that already had stopped at a red light." The evils found by the *ACORN* court—all associated with an individual entering the street itself, approaching a captive target, and requesting the immediate exchange of money—are simply not implicated where a willing driver approaches a willing would-be employee. *Cf. Hill v. Colorado*, 530 U.S. 703, 715-16 (2000) ("It is also important . . . to recognize the significant difference between state restrictions on a speaker's right to address a willing audience and those that protect listeners from unwanted communication."). Furthermore, the speech at issue here does not involve solicitation, or attempted solicitation, of immediate, in-hand contributions of funds. In fact, the record demonstrates (1) no Jornaleros or NDLON members were arrested for soliciting an immediate exchange of funds, and (2) day laborers have been arrested simply for being on the sidewalk and approaching a stopped vehicle. The very nature of the potential employer/day laborer relationship belies the majority's assertion that an immediate exchange of money is required. No rational employer would pay the day laborer before the work

was performed. Indeed, there is no demand that an unwilling driver do anything at all.

Day laborers in the City have not been prosecuted under this Ordinance for requesting an immediate, in-hand contribution of money. The majority's use of *ACORN* to justify the application of the Ordinance to their activities, therefore, represents a marked expansion of *ACORN*'s scope directly contrary to controlling precedent. More fundamentally, as an as-applied challenge, *ACORN* did not address the broader question that we are now called on to answer.

## B.   The Ordinance Is Not Narrowly Tailored to Legitimate Governmental Interests.

The Ordinance is not a valid time, place, or manner restriction because it is not narrowly tailored to the significant governmental interests asserted by the City.[6] To be narrowly tailored, an ordinance must " 'promote[ ] a substantial government interest that would be achieved less effectively absent the regulation' " and may not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). A narrowly tailored ordinance is one that " 'target[s] and eliminate[s] no more than the exact source of the 'evil' it seeks to remedy.' " *ACLU II*, 466 F.3d at 796 n.13 (quoting *Menotti v. City of Seattle*, 409 F.3d 1113, 1031-32 (9th Cir. 2005)). The Ordinance, on its face, sweeps far more broadly than necessary to advance

---

[6]The district court correctly found, and Jornaleros and NDLON do not challenge, that the City has significant interests in traffic flow and safety, crime prevention, and esthetic appearance of the public fora. *Comite*, 475 F. Supp. at 964 (citing *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507-08 (1981); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650 (1981); *Martin v. Struthers*, 319 U.S. 141, 144 (1943); *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064 (9th Cir. 2006); *ACORN*, 798 F.2d at 1268). For purposes of this appeal, however, the City has only asserted its interest in traffic flow and safety.

the City's interest in traffic flow and safety. This overinclusiveness is fatal to the constitutionality of the Ordinance.

As the district court explained, the Ordinance prohibits a wide variety of expression that bears little to no relationship to the City's proffered interests. *See, e.g.*, *Comite*, 475 F. Supp. 2d at 965 n.8 ("In fact, the Ordinance would technically apply to children selling lemonade on the sidewalk in front of their home, as well as to Girl Scouts selling cookies on the sidewalk outside of their school."). It expansively bans all solicitations (or attempts at solicitations) for employment, business, or contributions from an occupant of any motor vehicle. The Ordinance prohibits, among other things, solicitation of employment or a contribution from a motorist in a lawfully stopped or parked car. It prohibits an individual from standing on a sidewalk and distributing to a passenger in a lawfully stopped car fliers noting his availability for employment and providing a cell phone number. Similarly, the Ordinance would prohibit a restauranteur from standing on a sidewalk waiving a sign at drivers inviting them to patronize his establishment, or other signbearers on sidewalks seeking patronage or offering handbills even though their conduct does not pose a traffic hazard. *See ACORN*, 798 F.2d at 1269 n.8 ("The degree of distraction entailed by ACORN's 'tagging' practices is plainly far greater. It is much easier to ignore a billboard or pedestrian along the roadway . . . ."). Neither the City nor the majority explains the relationship these prohibitions bear to traffic flow and safety.

The majority dismisses the overbreadth challenge, asserting that "[h]ypothetical examples of how the government could theoretically apply an ordinance . . . are not sufficient to establish inadequate tailoring." Maj. Op. at 8376 (citing *Wash. St. Grange*, 128 S. Ct. at 1190 (2008)). The Supreme Court stated in *Washington State Grange* that courts approaching a facial challenge to a law "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. St. Grange*,

128 S. Ct. at 1190. Here, however, the district court properly confined its analysis to the statute's "facial requirements." As the district court reasoned, "by its very terms, the Ordinance at issue here sweeps in a much larger amount of 'solicitation' speech and speech-related conduct than the ordinance at issue in *ACORN*." *Comite*, 475 F. Supp. 2d at 964.

Courts " 'may impose a limiting construction on a statute only if it is readily susceptible to such a construction.' " *Stevens*, 130 S. Ct. at 1591-92 (quoting *Reno v. ACLU*, 521 U.S. 844, 884 (1997)); *see also S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1143-44 (9th Cir. 1998) (rejecting a limiting construction where the "Ordinance's plain language does not limit the scope of the regulated activity" as suggested by the county). The Ordinance is not "readily susceptible" to the majority's reading that it prohibits only "direct, in-person demands requiring an immediate response from drivers in traffic lanes." Maj. Op. at 8383. In *Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998), we confronted a Menlo Park ordinance that included a prohibition on the posting or displaying of signs on vehicles with the intent to "display, demonstrate, advertise, or attract the attention of the public." *Id.* at 634 n.3. Menlo Park proffered a construction that narrowed the prohibition to only "temporary" signs. *Id.* at 639. We rejected the attempt to narrowly construe the ordinance, noting that "we are not required to insert missing terms into the statute or adopt an interpretation precluded by the plain language of the ordinance" and that the "plain language of [the ban] applies to all signs on vehicles, not just temporary signs." *Id.*; *see also Conchatta Inc. v. Miller*, 458 F.3d 258, 265 (3d Cir. 2006) (finding the "plain terms" of a challenged ordinance not "readily susceptible" to a limiting construction); *Ripplinger v. Collins*, 868 F.2d 1043, 1056 (9th Cir. 1989) ("[T]he language of the definition does not seem readily susceptible to a narrowing construction. It would be necessary to add language requiring that the defendant have knowledge of the 'overall character' of the material . . . .").

By its very terms, the Ordinance bans all solicitation for contributions, employment, or business from an occupant of any motor vehicle. This is not a case in which "solicitation" may be construed only to include a physical exchange of funds as in *International Society for Krishna Consciousness v. Lee, Inc.*, 505 U.S. 672 (1992). In that case, the Supreme Court examined a regulation imposed by the New York Port Authority over all of New York's airports prohibiting, in part, "[t]he solicitation and receipt of funds." *Id.* at 676. The Court upheld the regulation under the reasonableness standard applicable to nonpublic fora. *See id.* at 683-84. Justice Kennedy in his concurring opinion—joined by Justices Blackmun, Stevens, and Souter—viewed the airports as public fora, but nonetheless voted to uphold the regulation. *See id.* at 704-05 (Kennedy, J., concurring). Justice Kennedy found that the regulation, properly read, reached only in-person demands for an immediate contribution of money because, under any broader reading of the term solicitation, "the 'receipt of funds' phrase would be written out of the provision." *Id.* at 704. Here, there is simply no way to be both faithful to the English language and to read the Ordinance as prohibiting only solicitations requiring an "immediate" response. The majority attempts in vain to rewrite the Ordinance to render it constitutional when its plain language embraces protected speech; we should not redraft the City's ordinances. Our obligation is to evaluate the ordinance the City passed, not the ordinance it could have, or should have, passed. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988) ("[W]e will not rewrite a state law to conform it to constitutional requirements."). Where a statute is overbroad, all enforcement is invalidated " 'until and unless a limiting construction or partial invalidation so narrows it as to remove the *seeming* threat or deterrence to constitutionally protected expression.' " *United States v. Adams*, 343 F.3d 1024, 1034 (9th Cir. 2003) (quoting *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)).

"Not to worry" the City (and the majority) say: The City construes the ordinance as reaching only people "soliciting

vehicles so as to cause a driver to stop in traffic" or in "any other manner that caused traffic blockages." "But the First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *Stevens*, 130 S. Ct. at 1591; *see also Conchatta*, 458 F.3d at 265 ("Past practice does not constitute a narrowing construction because it does not bind the enforcement agency, which could, at some point in the future, decide to target a broader range of establishments. This possibility of expanded enforcement creates a chilling effect."); *Odle v. Decatur County*, 421 F.3d 386, 397 (6th Cir. 2005) ("[N]either proof that an ordinance as currently applied has no unconstitutional effect, nor assurances offered by the relevant local authorities that the ordinance will not be put to such an effect in the future, constitute 'constructions' of the ordinance, as the term is ordinarily understood."). Thus, it is not true, as the majority asserts, that the City has "authoritatively construed" the Ordinance to apply to actual disruptions to traffic, and even if it were true that the City only narrowly enforces the Ordinance to meet its traffic and safety concerns, this would not save the Ordinance.

Similarly, in our en banc opinion in *Berger*, we relied on the plain language of the statute to find overbreadth without regard to how the city enforced its ordinance. There, a performer challenged several city regulations of Seattle Center, including a content-neutral permitting regime requiring "street performers" to obtain permits to perform in the park. The definition of "street performer" included "a member of the general public who engages in any performing art or the playing of any musical instrument, singing or vocalizing, with or without musical accompaniment." *Berger*, 569 F.3d at 1046. We recognized the breadth of the ordinance encompassed

> any individual who wishes to sing, dance, or play an instrument while on the Center's grounds. Protest songs, playing the guitar at a picnic, even whistling

are swept up into this broad definition. An individual strumming on a guitar at a family picnic surely poses no problem to the safety and convenience of fellow park-goers.

*Id.* We found that "the permitting requirement applies to street performers who pose no realistic coordination or traffic flow concerns." *Id.* Even though there was no evidence that Seattle applied the ordinance against a whistling tourist or guitar-playing picknicker, we did not turn a blind eye to the reach of the ordinance's plain language.

Finally, the City has numerous alternatives available to further its asserted interests that do not burden protected speech. "We have said that 'if there are numerous and obvious less-burdensome alternatives to the restriction on [protected] speech, that is certainly a relevant consideration in determining whether the 'fit' between means and ends is reasonable.' " *Menotti*, 409 F.3d at 1131 n.31 (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993)). In *Berger*, we recognized that the Seattle regulation's "broad sweep prohibits much more speech than the 'evil[s]' it seeks to remedy require, and the main objectives of the City's advance registration scheme could be achieved by far less intrusive means." *Berger*, 569 F.3d at 1048.

No "legal" imagination need be exercised here; the City can simply enforce its existing traffic and safety ordinances to eliminate its articulated concerns. *See* Cal. Veh. Code § 22500 (prohibiting vehicle stopping, standing, or parking in a number of areas); *id.* § 22651(b) (permitting removal of a vehicle that is obstructing the normal movement of traffic or creating a hazard to other traffic); *id.* § 21961 (allowing local authorities to adopt ordinances preventing pedestrians from crossing roadways in places other than crosswalks); Redondo Beach Municipal Code § 3-7.1004 ("No person shall stand in any roadway, other than in a safety zone or in a crosswalk, if such action interferes with the lawful movement of traffic."); *id.*

§ 3-7.1204 (allowing the City to establish no parking zones prohibiting persons from stopping, standing, or parking in those areas); *id.* § 3-7.1307 (allowing the City to prohibit parking in a number of circumstances including where it would "create a hazard to life or property or a serious obstruction to vehicular or pedestrian passage"). As this sketch of the regulatory landscape reveals, the City has ample means to advance its interest in traffic flow and safety without encroaching upon a large swath of protected expressive activity. The City has not even attempted to explain how a focused effort at enforcing the state and local traffic, littering, and harassment statutes would not advance its interests even more effectively than does the challenged Ordinance.

Given that the Ordinance encompasses a substantial amount of protected expressive activity unrelated to the City's articulated interests, the Ordinance is not narrowly tailored. This conclusion is reinforced by the "numerous and obvious less-burdensome alternatives" the City has at its disposal that would advance its interests equally well. *Menotti*, 409 F.3d at 1171. The City, therefore, has failed to meet its burden of demonstrating that the Ordinance " 'promotes a substantial government interest that would be achieved less effectively absent the regulation.' " *Ward,* 491 U.S. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)).

## C.   The Ordinance Leaves Open No Effective Alternative Avenue of Communication.

The Ordinance effectively eliminates the only means by which day laborers can communicate their availability for employment. The City bears the burden of demonstrating that the day laborers have ample alternatives to engage in their solicitation of employment. *Lim v. City of Long Beach*, 217 F.3d 1050, 1054 (9th Cir. 2000). It cannot rely on extenuated "alternatives" which may remotely or hypothetically provide an avenue for expression. Where " 'there is no other effective and economical way for an individual to communicate his or

her message,' alternative methods of communication are insufficient." *United Bhd. of Carpenters and Joiners of Am. v. NRLB*, 540 F.3d 957, 969 (9th Cir. 2008) (quoting *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 866 (9th Cir. 2001)). While we will not "invalidate a regulation merely because it restricts the speaker's preferred method of communication," the alternative must allow the individual to effectively convey her message to her intended audience. *Id.*; *Edwards*, 262 F.3d at 866.

The City advances a number of potential alternatives, none of which passes constitutional muster. First, it implicitly argues that door-to-door canvassing, telephone solicitation, or direct mailing would allow day laborers to solicit employment effectively.[7] As NDLON's Legal Programs Coordinator Chris Newman described, however, the informal, transitory nature of day laborer employment renders these more conventional means of solicitation and advertising ineffective. Morever, each of the City's suggestions would impose an economic burden upon day laborers which does not exist in the public forum. The cost and convenience of a suggested alternative is directly relevant to whether the alternative is constitutionally adequate. *See City of Ladue v. Gilleo*, 512 U.S. 43, 57 (1994); *Long Beach Area Peace Network*, 574 F.3d at 1025; *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 n.3 (9th Cir. 1990) ("In addition to accessibility to an audience or forum generally, an alternative has been held not 'ample' or

---

[7]The majority makes much of the fact that the *ACORN* court found these to be available alternatives when reviewing the Phoenix ordinance. This argument, however, displays the majority's fundamental misunderstanding of the nature of the solicitation at issue. As demonstrated above, the *ACORN* court examined only the statute as applied to ACORN's method of soliciting contributions of funds. While ACORN could not "tag" occupants of cars by entering the roadway, they could effectively raise money for their objectives through a multitude of alternative channels. Here, by contrast, the transitory, informal nature of day laborer employment and the reality of how day laborers are sought out and hired renders these same alternatives illusory.

adequate because, among other things, it is 'more expensive' than the prohibited means of communication." (citing *City of Watseka v. Ill. Pub. Action Council*, 796 F.2d 1547, 1558 (7th Cir. 1986)).

The City and majority also assert that soliciting pedestrians on the side of the road is an acceptable alternative. Maj. Op. at 8384-85. However, this "alternative" is also illusory. The Ordinance poses a serious risk that solicitation directed at pedestrians on the sidewalk will be chilled because a solicitor targeting pedestrians cannot control the potential response of passing motorists. A day laborer could intend to solicit only passing pedestrians, but if a driver stopped and attempted to engage him, it could appear to an observing police officer that he was attempting to solicit passing traffic. This lack of control over a driver's response, which is tantamount to a lack of control over a violation of the Ordinance, makes this "alternative" unavailable. More fundamentally, as the district court found, "most individuals who set out seeking to hire day laborers do so in their cars." *Comite*, 475 F. Supp. 2d at 968. Thus, that day laborers may technically remain free to solicit employment from pedestrians does not answer the relevant question: whether the day laborers would be able to solicit their target audience. *See United States v. Baugh*, 187 F.3d 1037, 1044 (9th Cir. 1999); *see also Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981) ("The First Amendment protects the right of every citizen to 'reach the minds of willing listeners and to do so there must be an opportunity to win their attention.").

Even if it were accepted that day laborers could reach *certain* members of their target audience by soliciting pedestrians, the alternative would still not be a sufficient means of protecting Plaintiffs' First Amendment interests. In *Edwards*, we held that an alternative which allowed the speaker to solicit only a segment of his target audience was inadequate. There, a Los Angeles ordinance prohibited the carrying of signs that were attached to wooden or plastic handles during

parades or public assemblies. *Edwards*, 262 F.3d at 858-59. The City of Los Angeles asserted that handing out leaflets, holding up signs, singing, shouting, or chanting constituted alternative means to convey messages. *Id.* at 867. We rejected those alternatives, finding that the noise and large size of the crowds rendered the proposed alternatives ineffective for the protestors "to convey their messages to the broad audience they seek to attract." *Id.* We reached this result despite the fact that *some* individuals in the crowd would have been able to see hand-held signs, obtain handbills, or hear the shouting. Compared to the use of supported signs, the proposed alternatives impermissibly narrowed the audience the speaker could reach. Similarly here; the suggested alternative means of soliciting pedestrians is an ineffective method for day laborers to reach their target audience. Therefore, it is legally insufficient.

The majority next argues that the ability of a day laborer to engage a driver who has lawfully parked constitutes a valid alternative. As already demonstrated, however, the plain text of the Ordinance bans this behavior. It broadly prohibits all solicitation of employment, business, or contributions from any occupant of a vehicle and it does not distinguish between legally parked, illegally parked, or stopped vehicles. An alternative is not constitutionally adequate if it is facially prohibited by the challenged ordinance.

Finally, the City claims that strip mall parking lots adjacent to the main areas in which day laborers congregate can operate as alternative avenues of communication. This suggestion is at odds with the City's assertion that it enacted the Ordinance in part due to the complaints of those very local business owners. *Comite*, 475 F. Supp. 2d at 967 n.9. The City has not shown that the proprietors of these establishments are willing to allow day laborers to congregate in their parking lots, so it cannot be said that this alternative is actually available.

The City relies on *Robins v. Pruneyard Shopping Center*, 23 Cal. 3d 899 (1979), *aff'd* 447 U.S. 74 (1980), and its progeny to argue that day laborers are free to exercise their First Amendment rights on private property, even over the objection of property owners. In *Pruneyard*, the California Supreme Court held that the California Constitution's guarantee of freedom of expression, Cal. Const. art. I, §§ 2-3, "protect[s] speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned." *Pruneyard*, 23 Cal. 3d at 910. Under *Pruneyard*, property owners may be compelled to allow expressive activity only where the premises have become the " 'functional equivalent of a traditional public forum.' " *Albertson's, Inc. v. Young*, 107 Cal. App. 4th 106, 118 (2003) (citing *Golden Gateway Ctr. v. Golden Gateway Tenants Ass'n.*, 26 Cal. 4th 1013, 1033 (2001)). California courts have explicitly rejected a broad reading of *Pruneyard* that would compel any store or facility that is "freely and openly accessible to the public" to allow expressive activity. *See, e.g.*, *Albertson's*, 107 Cal. App. 4th at 118 (holding the "freely and openly accessible" inquiry to be a "threshold" requirement).

The private parking lots the City suggests as alternative avenues of communication are attached to small, individual "proprietor-type operations, such as a doughnut shop, gas stations, restaurants and a '7-Eleven.' " *Comite*, 475 F. Supp. 2d at 967. It strains reality to argue that a doughnut shop or gas station has become the "functional equivalent" of a public forum like the massive outdoor shopping center in *Pruneyard*. Rather, as the district court found, "California courts have eschewed the application [of] *Pruneyard* to smaller spaces, such as the parking lots of large grocery stores." *Id.* For example in *Albertson's*, the California Court of Appeal concluded that individuals did not have the right to solicit in front of an Albertson's store, notwithstanding that it was part of a large complex built around a common parking lot. 107 Cal. App. 4th at 121. The Court of Appeal reasoned, in part, that there were no "enclosed walkways, plazas, courtyards, picnic

areas, gardens, or other areas that might invite the public to congregate." *Id.* Similarly, in *Trader Joe's*, the same court concluded that a Trader Joe's store and parking lot did not become the functional equivalent of a public forum simply because it was open to the public. The Court of Appeal there stated that "[f]ew would argue that a free-standing store, with abutting parking space for customers, assumes significant public attributes merely because the public is invited to shop there." *Trader Joe's Co. v. Progressive Campaigns, Inc.*, 73 Cal. App. 4th 425, 434 (1999). Like Albertson's or Trader Joe's, the small individual proprietorships involved in this case lack any indicia of a public forum, thus rendering *Pruneyard* inapplicable.

The City asserts that property owners' objections are merely speculative. The City belies its own record; it is undisputed that property owners' objections to day laborers were a driving force behind the adoption of the Ordinance. It defies common sense to conclude that property owners who objected to the day laborers congregating on public sidewalks near them, prompting the City to enact the Ordinance in the first place, would acquiesce to a proposal that would move the day laborers directly onto their private property. The City next argues that, were the property owners to object, the day laborers would be entitled to assert their right to assemble under *Pruneyard*. However, the burden is on the City—not the Plaintiffs—to prove the existence of alternative avenues of communication. As detailed above, the City has failed to demonstrate even a colorable argument that *Pruneyard* applies to the individual proprietorships it promotes as an alternative to city sidewalks. The City cannot meet its heavy burden for justifying restrictions on First Amendment rights by simply pointing to a legal doctrine and inviting the Plaintiffs to engage in what would likely be a protracted, losing legal battle.

Each of the potential alternatives asserted by the City is either inapplicable or constitutionally defective. Thus,

because the City failed to meet its burden of demonstrating the presence of alternative avenues of communication, the Ordinance is not a valid time, place, and manner regulation.

### III.

The majority tramples upon the right of free speech in the most traditional of public fora. It erroneously relies upon precedent involving an as-applied challenge to the constitutionality of an aspirationally similar statute and contorts the actual words of the Redondo Beach Ordinance beyond recognition. The district court got it right: The Redondo Beach Ordinance is an unconstitutional regulation of speech; it is not narrowly tailored to meet Redondo Beach's asserted governmental interests; and it fails to leave open alternative avenues for the day laborers' expression. I would affirm the district court's grant of summary judgment to Jornaleros and NDLON as well as the award of attorneys' fees and costs to them.